**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CYLINDA SCOTT, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 21 C 820 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| B.J. WALKER, former Acting Director of the | ) | |
| Illinois Department of Children and Family | ) | |
| Services, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

In the span of one year, various medical professionals reported five sets of parents

("Parents")[1] to the Illinois Department of Children and Family Services ("DCFS") for refusing

the administration of certain medical procedures for their minor children at birth. As a result,

DCFS investigated the Parents for medical neglect. In response, the Parents filed this lawsuit,

individually and on behalf of their minor children, alleging violations of their Fourth and

Fourteenth Amendment rights under 42 U.S.C. § 1983. The Parents bring their claims against

current and former DCFS employees,[2] the private hospital where three of the children were born

(the University of Chicago Medical Center ("UCMC")), and Dr. Stephanie Liou, a UCMC

physician who interacted with one set of parents at UCMC. UCMC and Dr. Liou (collectively,

the "UCMC Defendants") now move to dismiss the Parents' § 1983 claims against them under

---

[1] Cylinda Scott, Michael Scott, and Baby A; Vivian Lee, Melvin Taylor, and Baby G; Kristen Benages, Kevin Benages, and Baby GB; Tenika Flowers-Uwalka, Eze Uwalka, and Baby I; and Whitney Bright, Erik Zuma, and Baby Z.

[2] B.J. Walker, Former DCFS Director, in her individual capacity; DCFS Caseworkers Jacqueline Stanton, Julia Luke, Ernesta McVeigh, Erica Goolsby, and Dora Allen in their individual capacities; and Current DCFS Director Marc D. Smith in his individual capacity.

Federal Rule of Civil Procedure 12(b)(6).  Because the third amended complaint ("TAC") fails to sufficiently plead that the UCMC Defendants acted under color of state law, the Court dismisses the Parents' claim against them with prejudice.

## BACKGROUND[3]

### I.    Medical Procedures at Issue

The Parents refused the administration of the intramuscular Vitamin K shot ("Vitamin K shot") and/or erythromycin eye ointment.  The Vitamin K shot is a means of preventing Vitamin K Deficiency Bleeding ("VKDB") in newborns, which is a serious but rare medical condition. Healthy newborns without VKDB risk factors are at a significantly lower risk of developing VKDB.  There are safety concerns and risks associated with administration of the Vitamin K shot in newborns, including death in rare cases.  Alternatives to the Vitamin K shot for preventing VKDB include supplementing breast milk with liquid drops of Vitamin K.

Medical professionals apply erythromycin eye ointment to a newborn's eyes to prevent an infection called ophthalmia neonatorum which, if untreated, can cause blindness in a small percentage of newborns.  However, infants born to mothers who do not have an active gonorrhea or chlamydia infection at the time of birth or who are born by caesarean are not at risk of exposure to ophthalmia neonatorum.  There are health risks associated with the administration of erythromycin eye ointment in newborns including pain and temporary loss of vision.

Illinois law requires all obstetric departments to administer "[a] single parenteral dose of vitamin K-1 . . . shortly after birth, but usually within the first hour after delivery, as a prophylaxis against hemorrhagic disorder in the first days of life."  Ill. Admin. Code tit. 77,

---

[3] The Court takes the facts in the background section from the TAC and presumes them to be true for the purpose of resolving the UCMC Defendants' motion to dismiss.  *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).  The Court "may also take judicial notice of matters of public record."  *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043–44 (7th Cir. 2019).

§ 250.1830(g)(8).  Illinois law also requires obstetric departments to administer "ophthalmic ointment or drops containing tetracycline or erythromycin . . . into the eyes of the newborn" within one hour of delivery "as a preventative against ophthalmia neonatorum."  Ill. Admin. Code tit. 77, § 250.1830(g)(7); *see also* 410 Ill. Comp. Stat. 215/3.

## II.     DCFS Statutory and Regulatory Background

DCFS is the sole Illinois agency charged with the responsibility of receiving and investigating reports of child abuse and neglect under the Illinois Abused and Neglected Child Reporting Act ("ANCRA").  325 Ill. Comp. Stat. 5/7.3(a).  ANCRA requires medical professionals to "immediately report" to DCFS "when they have reasonable cause to believe that a child known to them in their professional or official capacities may be an abused child or a neglected child."  325 Ill. Comp. Stat. 5/4(a), (a)(1).  In relevant part, ANCRA defines "neglected child" as a child who "is not receiving the proper or necessary support or medical or other remedial care recognized under State law as necessary for a child's well-being."  325 Ill. Comp. Stat. 5/3.  Medical personnel who knowingly and willfully fail to report abuse or neglect as required under ANCRA are subject to criminal liability.  325 Ill. Comp. Stat. 5/4(m).  In return, ANCRA provides "immunity from any liability, civil, criminal or that otherwise might result by reason of such actions" to any person who submits a report in good faith.  325 Ill. Comp. Stat. 5/9.  ANCRA also requires a presumption of good faith on behalf of reporters.  *Id.*

Once DCFS receives a report, it must "protect the health, safety, and best interests of the child in all situations in which the child is vulnerable to child abuse or neglect."  325 Ill. Comp. Stat. 5/2(a).  To do so, DCFS staff must conduct an initial investigation to determine whether there is reasonable cause to believe child neglect exists.  Ill. Admin. Code tit. 89, § 300.100(a). In relevant part, DCFS defines "medical neglect" as "[l]ack of proper or necessary health care

3

recognized under State law as necessary for the child's well-being" or "[p]roper and necessary preventive health care to include preventive health care, such as HIV and newborn screening tests that place children at serious risk of illness due to lack of early detection and treatment." Ill. Admin. Code tit. 89, § 300 app. B, allegation 79.

> ANCRA also dictates the process for taking temporary protective custody of a child:
>
> > An officer of a local law enforcement agency, designated employee of [DCFS], or a physician treating a child may take or retain temporary protective custody of the child without the consent of the person responsible for the child's welfare, if (1) he has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety; and (2) there is not time to apply for a court order under the Juvenile Court Act of 1987 for temporary custody of the child.

325 Ill. Comp. Stat. 5/5.  DCFS clarifies that temporary protective custody is appropriate if there is reason to believe that "leaving the child in the home or in the care and custody of the child's caregiver presents an *imminent danger to the child's life or health*."  Ill. Admin. Code tit. 89, § 300.120(a)(1) (emphasis added).  ANCRA requires any person who takes temporary protective custody of a child to "immediately notify [DCFS]" and in response, DCFS "shall promptly initiate proceedings under the Juvenile Court Act of 1987 for the continued temporary custody of the child."  325 Ill. Comp. Stat. 5/5.  If a physician takes temporary protective custody of a child, she must notify the "person in charge" of the hospital "who shall then become responsible for the further care of such child in the hospital . . . under the direction of [DCFS]."  *Id.*  This care includes "the granting of permission to perform emergency medical treatment to a minor" where "the failure to render such treatment will likely result in death or permanent harm to the minor, and there is not time to apply for a court order under the Juvenile Court Act of 1987."  *Id.*

4

### III.    DCFS Policy

The Parents challenge the constitutionality of a section of an internal DCFS procedural guide, intended to aid DCFS employees in managing and investigating reports of child abuse and neglect.  The challenged section ("Section H"), established in October 2015, reads:

> For purposes of child protection services, the administration of silver nitrate or ophthalmic solution and Vitamin K shots or pills to newborns is considered medically necessary.  Calls received at SCR concerning a parent or guardian denying consent for the administration of these treatments shall be taken as reports of medical neglect.
>
> **Note**:
>
> If a physician notifies SCR that temporary protective custody has been taken because the parent/caregiver's religious beliefs do not permit them to consent to necessary medical car[e], such information must be transmitted by the physician to the local State's Attorney's Office.  No investigation will be taken unless there is additional information supporting other allegations of abuse or neglect.

Doc. 37 ¶ 125.  Dr. Paula Jaudes (now deceased) was the DCFS Medical Director when DCFS established Section H.  Dr. Jaudes was also a UCMC professor of pediatrics and a board member of the Illinois Chapter of the American Academy of Pediatrician's ("ICAAP")[4] Committee on Child Abuse and Neglect ("COCAN") at the time.

### A.    Adoption of Section H as Official DCFS Policy

Over the next two years, this internal DCFS policy became known to pediatricians in Illinois.  In 2017, some members of the Perinatal Advisory Committee of the Illinois Department of Public Health ("PAC") vocalized concerns about Section H.  In May 2017, the PAC chairman requested a meeting with DCFS officials to discuss these concerns.  In June, Dr. Jaudes and then-DCFS Deputy Director of Child Protection, Dr. Nora Harms-Pavelski, met with PAC officials.

---

[4] ICAAP is a professional organization of approximately 2,300 pediatricians in Illinois.

Dr. Jaudes and Dr. Harms-Pavelski assured PAC officials that DCFS would not consider refusal of the Vitamin K shot *per se* medical neglect and that such a refusal did not mandate a call to DCFS. Dr. Jaudes and Dr. Harms-Pavelski said that if DCFS received a call based solely on refusal of the Vitamin K shot, there would not be a DCFS investigation.

High-ranking ICAAP members, including Dr. Jill Glick, disagreed with this decision and voiced their disapproval to high-ranking DCFS officials. Dr. Glick is a UCMC pediatrician, a member of DCFS' Advisory Board, and a member of COCAN. At an August 2017 COCAN meeting, Dr. Glick and other pediatricians encouraged Dr. Jaudes to convince DCFS to make Section H and the authorization of taking newborns into protective custody to forcibly administer the Vitamin K shot DCFS' official policy. In response, on October 24, 2017, DCFS officials notified pediatricians and hospitals, including UCMC, that DCFS would enforce Section H and pediatricians and hospitals should report refusals of the Vitamin K shot as medical neglect. In November, outside of the formal administrative-rule-making process, then-Director Walker adopted this October 24 directive as the official policy of DCFS. In response, Illinois hospitals and medical professionals agreed to report parental refusals of the Vitamin K shot to DCFS as medical neglect.

### B. Rescission of Section H

In June and July 2018, a group of concerned parents confronted PAC members about Section H. Around this time, a Rules Analyst for the Joint Committee on Administrative Rules ("JCAR") in the Illinois General Assembly emailed an official at DCFS' Office of Children and Family Policy, Bruce Dubre, to inquire about Section H. On July 23, Dubre responded:

> DCFS does not take reports of medical neglect for a parent
> refusing to have their child vaccinated; however, until recently we
> have accepted reports of parents who refuse to have their newborn
> treated with silver nitrate eye drops and vitamin K shots. Both of

> these treatments must be administered within the first 24 hours of
> life or they no longer have efficacy. The reason DCFS took these
> situations as the basis for medical neglect is due to the Infant Eye
> Disease Act [410 Ill. Comp. Stat. 215/3] requiring the application
> of the silver nitrate solution and because vitamin K shots are
> required via Title 77 Section 250.1830. Both of the rule and law
> apply to nursing staff and are not in ANCRA. As there is no
> mention of these procedures in Rule 300, we have issued an Action
> Transmittal immediately revoking the Department's policy of
> using a parent's failure to approve of either treatment as a basis for
> an allegation of medical neglect.

*Id.* ¶ 161.

On August 2, 2018, then-DCFS Director Walker rescinded Section H via a letter to "DCFS staff and stakeholders," including UCMC. *Id.* ¶ 162. The letter announced that, effective immediately, DCFS would no longer consider a parent's refusal of the Vitamin K shot and/or erythromycin eye ointment for their newborns as *per se* medical neglect. Continuing, the letter said, "In effect since 2015, this procedure inappropriately identifies what can and should be considered 'medically necessary.' Making that kind of determination falls outside the confines of our statutory and professional mission and judgement." *Id.*

## IV. UCMC Policy

UCMC's policy is to "report every parent who refuse[s] Vitamin K shots" despite DCFS' rescission of Section H. *Id.* ¶ 19. UCMC's policy further "allow[s], encourage[s] and/or require[s] its physicians, such as Dr. Liou, to take or threaten to take babies into protective custody based on [refusal of the Vitamin K shot]." *Id.* ¶ 213. Dr. Glick worked with other UCMC pediatricians to develop UCMC's policy in 2017 and explained in an August 10, 2017 email that "DCFS recognizing [Vitamin K refusal] as child medical neglect" was the impetus for developing UCMC's policy. *Id.* ¶ 142 (alteration in original). UCMC developed its policy for internal use and generally made it unavailable to the public. At an April 12, 2018 PAC meeting,

a UCMC pediatrician and PAC Board member asserted that "uniformity in Vitamin K policies, as well as secrecy, among hospitals" was necessary so that patients could not "transfer hospitals once they found that their babies would be taken into protective custody for refusing Vitamin K shots." *Id.* ¶ 154. In response to a question from another pediatrician regarding whether they could be sued for taking a child into protective custody for refusing a Vitamin K shot, the UCMC pediatrician "responded, 'no,' they could not, 'because you have their . . . you took protective custody. That's the part . . . That's the part that we have to assure with DCFS. That when we do this . . . DCFS has to say, 'This is our protocol, no matter what else we do: You are protected.'" *Id.* (alterations in original).

## V.    The Parents' Experiences

### A.    Cylinda Scott, Michael Scott, and Baby A

Baby A was born to Cylinda and Michael Scott on February 14, 2019 at UCMC. Baby A was healthy at birth and the Scotts refused administration of the Vitamin K shot. In response, UCMC nurses and doctors harassed the Scotts about their refusal and threatened to call DCFS if they did not allow Baby A to receive the Vitamin K shot. Dr. Liou also threatened to take Baby A into protective custody to administer the Vitamin K shot. In response, the Scotts called the Chicago Police Department ("CPD"). Upon their arrival, CPD ordered the UCMC staff to refrain from taking Baby A into protective custody. Dr. Liou, and/or a UCMC employee on Dr. Liou's behalf, later called DCFS to report the Scotts' refusal of the Vitamin K shot as medical neglect. DCFS investigated the Scotts for medical neglect but ultimately closed the investigation as unfounded and not made in good faith.

### B.    Vivian Lee, Melvin Taylor, and Baby G

Baby G was born healthy to Vivian Lee and Melvin Taylor on May 3, 2019 at UCMC. The couple refused administration of the Vitamin K shot on Baby G.  In response, several UCMC doctors attempted to convince Lee and Taylor to allow Baby G to receive the Vitamin K shot and threatened to call DCFS if they did not.  Specifically, Dr. Lainie Ross told the couple that they could lose custody of Baby G if they continued to refuse the Vitamin K shot.  Dr. Ross, and/or a UCMC employee on Dr. Ross' behalf, later called DCFS to report Lee and Taylor's refusal of the Vitamin K shot as medical neglect.  DCFS investigated the couple for medical neglect but ultimately closed the investigation as unfounded and not made in good faith.

### C.    Whitney Bright, Erik Zuma, and Baby Z

Baby Z was born healthy to Whitney Bright and Erik Zuma on February 3, 2020 at UCMC.  The couple refused administration of the Vitamin K shot and erythromycin eye ointment on Baby Z.  In response, UCMC doctors threatened to call DCFS to report Bright and Zuma for medical neglect if they continued to refuse the procedures.  The couple showed a UCMC doctor DCFS' rescission of Section H and in response, the doctor said that UCMC knew of the rescission but that it was UCMC's policy to continue to report these refusals to DCFS. UCMC staff later called DCFS to report Bright and Zuma's refusals as medical neglect.  DCFS investigated the couple for medical neglect but ultimately closed the investigation as unfounded and not made in good faith.

### LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits.  Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in

the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.     Under Color of State Law

"In order to state a claim under Section 1983, a plaintiff must allege that the defendants deprived him of a right secured by the Constitution or laws of the United States, and that the defendants acted under color of state law." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1009 (7th Cir. 2000) (citation omitted). "[M]erely private conduct, no matter how discriminatory or wrongful," cannot lead to § 1983 liability. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation omitted). The UCMC Defendants, as private actors, move to dismiss the claims against them, arguing that the TAC fails to sufficiently allege they acted under color of state law.[5] The Supreme Court has set forth multiple tests to assist courts in determining whether private entities acted under color of state law, "including the 'symbiotic relationship test, the state command and encouragement test, the joint participation doctrine, and the public function test.'" *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015). The Parents rely on the joint participation doctrine and public function test in arguing that the TAC

---

[5] The UCMC Defendants make additional arguments regarding the sufficiency of the TAC, but because the Court finds this issue dispositive, it does not address those arguments.

sufficiently alleges that the UCMC Defendants acted under color of state law. The Court addresses each test in turn.[6]

### A.  Joint Participation/Conspiracy

"[A] private citizen can act under color of law if there is 'evidence of a *concerted effort* between a state actor and that individual.'" *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) (citation omitted). To establish § 1983 liability for a private actor under this theory, "a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents." *Brokaw*, 235 F.3d at 1016 (citation omitted); *see also Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 825 (7th Cir. 2019) (using "joint participation doctrine" and "conspiracy theory" interchangeably). "It is not sufficient to allege that the (private and state) defendants merely acted in concert or with a common goal. There must be allegations that the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding." *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980) (citation omitted). "[M]ere allegations of joint action or a conspiracy do not demonstrate that the defendants acted under color of state law and are not sufficient to survive a motion to dismiss." *Spiegel*, 916 F.3d at 616 (citation omitted). Such allegations must "be supported by some factual allegations suggesting such a 'meeting of the minds.'" *Tarkowski*, 644 F.2d at 1206 (citation omitted). Circumstantial

---

[6] The Court "recognize[s] that these formulations [of the state action doctrine] are susceptible to semantic variations, conflations and significant overlap in practical application" and "that they 'lack rigid simplicity.'" *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009) (citation omitted). However, following the Seventh Circuit's direction, the Court "believe[s] that it is useful to describe these tests" using these names. *Id.* By doing so, the Court does not overlook the doctrine's complexity or the fluidity of the tests.

evidence can establish a conspiracy, but speculation cannot. *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003).

In a related case also concerning Section H, *Holderman v. Walker*, No. 19 C 6324, the Court found that the complaint failed to adequately allege that UCMC and Dr. Glick jointly acted with DCFS when adopting UCMC's policy to report all parental refusals of the Vitamin K shot and erythromycin eye ointment to DCFS as medical neglect. 2021 WL 1192441, at *13, 15 (N.D. Ill. Mar. 30, 2021). The Court further found:

> And while the alleged agreement between the medical professionals and DCFS contemplated the initiation of DCFS investigations based on parental refusals of these medical treatments, it did not extend to permitting physicians to take custody of the newborns in response to these refusals. In fact, the Complaint suggests that even after ICAAP and Dr. Glick petitioned DCFS to adopt such a policy, DCFS did not do so and Section H contains no reference to permitting medical professionals to take newborns into protective custody in order to administer either of these medical treatments. Therefore, any allegations relating to taking custody of the newborns do not support joint action between the medical professionals and DCFS because again, there is no "meeting of the minds" where one party takes an action the other party has either expressly disavowed or at best, simply not contemplated.

*Id.* at *15. The Parents assert that the TAC includes the following allegations that were not present in the *Holderman* complaint: actions taken by Dr. Jaudes and Glick "in their dual roles as UCMC physicians and DCFS advisors" and DCFS' "tacit approval" of UCMC's protective custody policy. Doc. 50 at 10–12. Thus, the Parents argue that, unlike in *Holderman*, the TAC sufficiently alleges that UCMC jointly acted with DCFS in implementing and enforcing its protective custody policy.[7]

---

[7] The TAC also challenges the UCMC Defendants' actions in reporting the Parents to DCFS for medical neglect based solely on their refusal of the Vitamin K shot and/or erythromycin eye ointment. However, in *Holderman*, the Court found that such reports, "standing alone, are not enough to allege joint action or conspiracy between the medical professionals, who are mandatory reporters, and DCFS." 2021 WL

1.        **Dr. Jaudes and Dr. Glick's Actions**

First, the Parents point to allegations in the TAC regarding Dr. Glick's advocacy for Section H, Dr. Jaudes' role in implementing Section H, and Dr. Glick's role in implementing UCMC's protective custody policy.  As explained in *Holderman*, 2021 WL 1192441, at *11–12, the First Amendment protects Dr. Glick's actions related to her petitioning of DCFS and public advocacy for Section H and taking children into protective custody in these circumstances, *see, e.g.*, Doc. 37 ¶ 139 (alleging Dr. Glick "encouraged Dr. Jaudes to convince DCFS" to adopt such policies).  The Parents argue that Dr. Glick went beyond "pure advocacy" because "there was an agreement between these DCFS and UCMC officials to deny parents their constitutional rights, followed up by actions in enacting, implementing, and enforcing a UCMC policy that did just that."  Doc. 50 at 11.  But the Parents fail to point to any allegations in the TAC that support this argument and the Court sees none.  Thus, the only factual allegations regarding Dr. Glick that can form the basis for the UCMC Defendants' liability are: (1) "Dr. Glick worked with other UCMC pediatricians to develop" UCMC's policy, *id.* ¶ 141, and (2) Dr. Glick told DCFS officials that "DCFS recognizing [Vitamin K refusal] as child medical neglect" was the impetus for developing UCMC's policy, *id.* ¶ 142 (alteration in original).  These allegations merely suggest that UCMC based its protective custody policy on Section H.  This falls short of suggesting a "meeting of the minds" between UCMC and DCFS.  *Tarkowski*, 644 F.2d at 1206 (citation omitted); *see Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (private actor does not become a state actor simply by "seek[ing] to rely on some state rule governing their interactions with the community surrounding them").

---

1192441, at *14.  As a result, here, the Parents focus on Dr. Liou's threat to take Baby A into protective custody pursuant to UCMC's protective custody policy to argue that the TAC sufficiently alleges that the UCMC Defendants acted under color of state law.

Nonetheless, the Parents assert that "a reasonable inference from the complaint is that Dr.

Glick, a DCFS Advisory Board member, and Dr. Jaudes, DCFS's Medical Director, would not

[have] sanctioned UCMC's 'protective custody' policy had they not believed they had at least

the tacit approval of DCFS." Doc. 50 at 12. However, the Parents concede that Dr. Glick is a

private actor.[8] So, her approval of UCMC's policy or her belief regarding its legitimacy does not

demonstrate that UCMC jointly acted or conspired with DCFS through its policy. Further, as

explained below, the TAC does not plausibly allege that either Dr. Jaudes or DCFS "sanctioned"

UCMC's protective custody policy. Thus, the additional allegations regarding Dr. Jaudes and

Dr. Glick's actions fail to demonstrate that the UCMC Defendants acted under color of state law.

### 2. DCFS' Approval of UCMC's Policy

Next, the Parents point to allegations in the TAC regarding DCFS' approval of UCMC's

protective custody policy. *See, e.g.*, Doc. 37 ¶ 140 (alleging DCFS "gave their tacit and/or

express permission and/or encouragement for UCMC to develop and implement its 'protective

custody' policy"). However, the only factual allegations that support these conclusory

statements relate to DCFS' adoption of Section H. *See Tarkowski*, 644 F.2d at 1206 (allegations

of joint action or conspiracy must "be supported by some factual allegations suggesting such a

'meeting of the minds'" (citation omitted)). The TAC alleges that after Dr. Glick "encouraged

Dr. Jaudes to convince DCFS" to authorize physicians taking children into protective custody for

parental refusals of the Vitamin K shot, DCFS "gave their tacit and/or express permission and/or

encouragement" of UCMC's protective custody policy by adopting Section H. Doc. 37 ¶¶ 139–

43. The main text of Section H does not mention protective custody, but the TAC alleges that

---

[8] The Parents waived any argument that Dr. Glick is a state actor because of her position on the DCFS
Advisory Board by failing to raise it in their response. *See Marling v. Littlejohn*, 964 F.3d 667, 669 (7th
Cir. 2020) (declining to pursue a potential argument that a party did not make); *Alioto v. Town of Lisbon*,
651 F.3d 715, 721 (7th Cir. 2011) ("[A] person waives an argument by failing to make it before the
district court.").

the "Note" portion "appeared to be encouraging, authorizing, and/or assuming that physicians would take babies into protective custody." *Id.* ¶ 137. The Note reads:

> If a physician notifies SCR that temporary protective custody has been taken because the parent/caregiver's religious beliefs do not permit them to consent to necessary medical car[e], such information must be transmitted by the physician to the local State's Attorney's Office. No investigation will be taken unless there is additional information supporting other allegations of abuse or neglect.

*Id.* ¶ 125. One cannot reasonably infer from DCFS' adoption of Section H that DCFS approved of UCMC's protective custody policy. To the contrary, the only reasonable inference that one can draw from the TAC is that despite Dr. Glick's advocacy, DCFS chose not to direct physicians to take temporary protective custody of children in these circumstances. The Note does not contain any such instruction and, if anything, indicates that DCFS did not approve of such actions. *See id.* ("No investigation will be taken unless there is additional information supporting other allegations of abuse or neglect.").

Moreover, the incidents alleged in the TAC occurred after DCFS rescinded its policy that it would consider refusals of the Vitamin K shot as medical neglect because it had "inappropriately identifie[d] what can and should be considered 'medically necessary.'" *Id.* ¶ 162. The TAC alleges that DCFS did not rescind the Note portion of Section H, indicating DCFS' continued approval of UCMC's policy. *Id.* ¶ 214. However, the Note only pertains to refusals of "necessary medical car[e]" based on religious beliefs and instructs DCFS employees not to investigate such refusals "unless there is additional information supporting other allegations of abuse or neglect." *Id.* ¶ 125. Therefore, the Note cannot possibly "approve and/or condone" UCMC's policy to take protective custody of children based solely on parental refusals

15

of the Vitamin K shot, regardless of the basis for the refusal, after DCFS had indicated it would not consider such a refusal, standing alone, to be medical neglect. *Id.*

The TAC also alleges that after UCMC adopted its policy and before DCFS rescinded the main text of Section H, a UCMC pediatrician told other pediatricians that in order to avoid liability for taking children into protective custody for parental refusals of the Vitamin K shot, they "have to assure with DCFS" that doing so was DCFS' "protocol." *Id.* ¶ 154. If anything, this allegation demonstrates that, months after it adopted its protective custody policy and even when DCFS considered such refusals to be medical neglect, UCMC was still unsure whether DCFS condoned taking children into protective custody for refusals of the Vitamin K shot. Although the TAC alleges that UCMC "made sure that it had the official approval of DCFS," the TAC does not plausibly allege that DCFS ever gave such approval. *Id.* As a result, the new allegations regarding DCFS' approval of UCMC's protective custody policy also fail to demonstrate that the UCMC Defendants acted under color of state law. Therefore, like the complaint in *Holderman*, the TAC does not plausibly allege that the UCMC Defendants jointly acted or conspired with DCFS by implementing and enforcing its protective custody policy.

### B. Public Function

A private party can also act under color of state law "when the [S]tate delegates a public function to [it]." *Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019) (first alteration in original). This occurs when the private party "perform[s] an action that is 'traditionally the exclusive prerogative of the State.'" *Listecki*, 780 F.3d at 740 (citation omitted). "This test is rarely met." *Id.* The TAC alleges that ANCRA gives private physicians the power to take temporary protective custody of children, which is an action traditionally "within the exclusive power of the State." Doc. 37 ¶ 203; *see* 325 Ill. Comp. Stat. 5/5 ("An officer of a local law

16

enforcement agency, designated employee of [DCFS], or a physician treating a child may take or retain temporary protective custody of the child . . . .").  Thus, the Parents argue that the TAC sufficiently alleges that the UCMC Defendants acted under color of state law when Dr. Liou abused this state-delegated power by threatening to take Baby A into protective custody solely because of the Scotts' refusal of the Vitamin K shot.

### 1. Exclusive Prerogative of the State

To determine if a function is the *exclusive* prerogative of the State, courts look to the "[h]istorical practice" of the particular state at issue or "the state statutory scheme."  *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 56.  The Parents cite *Letisha A by Murphy v. Morgan* to support their contention that the ability to take temporary protective custody of children is within the exclusive power of the State of Illinois.  855 F. Supp. 943, 949 (N.D. Ill. 1994) ("[T]he State of Illinois has historically acted on behalf of minors to protect their personal and property interests.").  However, in *Letisha A*, based on the text of the Juvenile Court Act of 1987, the court concluded that because "[c]lose relatives, other suitable individuals, and private organizations may serve as legal custodians of abused and neglected children," "it is not the exclusive function of the State to care for and protect minors who are adjudicated to be abused and neglected by their natural parents." *Id.*  Thus, although the State has historically acted to protect minors, Illinois' statutory scheme makes clear that protecting minors is not the *exclusive* function of the State.  *See also Evans v. Torres*, No. 94 C 1078, 1996 WL 5319, at *8 (N.D. Ill. Jan. 4, 1996) (finding that because Illinois law permits private individuals to conduct child abuse investigations, "the investigation of child abuse is not exclusively within the authority of the state").

Here, by designating the authority to private physicians and institutions, ANCRA and the Juvenile Court Act of 1987 make clear that protecting a child's welfare by taking temporary

protective custody of the child is not the *exclusive* function of the State. *See* 325 Ill. Comp. Stat. 5/5 (ANCRA authorizes law enforcement, DCFS, and private physicians to take temporary protective custody of children in certain circumstances); 705 Ill. Comp. Stat. 405/2-7(1) (Juvenile Court Act of 1987 defines "temporary protective custody" as "custody within a hospital or other medical facility or a place previously designated for such custody by the Department of Children and Family Services, subject to review by the court, including a licensed foster home, group home, or other institution").

The Parents also point to cases in which courts have found that private security guards acted under color of state law when statutes provide them with "powers traditionally reserved for law enforcement" in support of their argument that ANCRA delegates a public function to physicians. Doc. 50 at 13. As the Parents acknowledge, "[t]he issue in these cases is whether the delegation is 'limited and local' in nature, or whether the delegation is equal to those of the police in general." *Id.*; *see Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 630 (7th Cir. 1999). Here, the TAC alleges that ANCRA gives private physicians the power to take temporary protective custody of children "in an extremely limited and circumscribed manner." Doc. 37 ¶ 204. Indeed, ANCRA only permits a "physician treating a child" to take temporary protective custody of the child "if (1) he has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety; and (2) there is not time to apply for a court order under the Juvenile Court Act of 1987 for temporary custody of the child." 325 Ill. Comp. Stat. 5/5. Further limiting their powers, after taking temporary protective custody of a child, ANCRA requires physicians to "immediately notify [DCFS]" and the "person in charge" of the hospital, who then "become[s] responsible for the further care of such child under the direction of [DCFS]." *Id.*

Thus, ANCRA limits this grant of power to physicians to certain circumstances and for a very short timeframe. It clearly does not delegate to private physicians the same general powers provided to law enforcement or DCFS. As a result, it does not delegate a public function to them. *Compare Payton*, 184 F.3d at 630 (finding that an ordinance delegating "the powers of the regular police patrol" to special police officers and requiring them to follow all police rules "delegate[d] police powers otherwise exclusively reserved to the state, thus making those who act pursuant to it potentially liable under § 1983"), *with Wade v. Byles*, 83 F.3d 902, 906 (7th Cir. 1996) (finding that a private security guard whose contract limited the exercise of his powers to certain circumstances was not performing a function "traditionally [within] the exclusive prerogative of the state" and was therefore not acting under color of state law when he shot someone (citation omitted)).

### 2. *Rodriguez v. Plymouth Ambulance Services*

The Parents urge the Court to employ the same analysis the Seventh Circuit utilized in *Rodriguez v. Plymouth Ambulance Services* to evaluate whether the UCMC Defendants actions' "can be fairly attributed to the state." 577 F.3d at 825. However, a different public function was at issue in *Rodriguez*. In that case, the Seventh Circuit analyzed whether private medical professionals and institutions acted under color of state law when providing medical care to state prisoners. *Id.* at 829–32. The Parents contend that *Rodriguez* is not limited to prisoner cases, but the cases they cite for support concern the same state function: caring for individuals in state custody. *See Golbert v. Aurora Chicago Lakeshore Hosp.*, No. 19-cv-08257, 2021 WL 952528, at *5 (N.D. Ill. Mar. 11, 2021) (noting "[t]he relevant issue here is . . . whether providing medical care to children already in DCFS custody is a traditionally exclusive state function" and finding complaint sufficiently alleged private hospital acted under color of state law by doing so); *Woods*

*v. Maryville Acad.*, No. 17 C 8273, 2018 WL 6045219, at *8 (N.D. Ill. Nov. 19, 2018) (finding complaint sufficiently alleged that a private residential facility for minors acted under color of state law by alleging that "the State had custody over [the child] and it fulfilled its corresponding duties of care and protection by delegating them to [the private facility]"). Here, as the Parents concede, "the [relevant] traditional public function is the threatened forced seizure of the Plaintiffs' baby," and more specifically, taking a child into temporary protective custody. Doc. 50 at 14. Therefore, *Rodriguez* does not control. *See Rodriguez*, 577 F.3d at 825 (stating that the Court's "focus must be on the particular *function* of the medical care provider in the fulfillment of the state's obligation"); *see also Vaught v. Quality Corr. Care, LLC*, No. 15-CV-346, 2018 WL 656361, at *3 (N.D. Ind. Feb. 1, 2018) (describing the factors identified in *Rodriguez* as "a test . . . to determine whether a private medical professional who treats an in-custody patient acts under the color of state law").

However, even if it did, applying the *Rodriguez* factors would lead to the same result. The court in *Rodriguez* "focus[ed] on the relationship among the state, the health care provider *and* the prisoner." *Rodriguez*, 577 F.3d at 826. First, the court noted that the setting in which the medical professionals performed the public function and "the *degree* to which the professional decisions made in [performing the function] are influenced by the status of the patient as a prisoner" were important to the analysis. *Id.* at 827. With respect to this factor, the Parents contend that the Scotts were effectively prisoners at UCMC because they were not free to leave or use their own medical judgment. However, the relevance of the plaintiff's status as a prisoner in *Rodriguez* was that "the State was constitutionally obligated to provide medical treatment to injured inmates" and "a medical care provider in the correctional setting inevitably is affected by that setting in the performance of his medical functions." *Id.* at 826 (citation omitted).

20

Here, regardless of whether the Scotts felt free to leave UCMC, the State was not constitutionally obligated to care for Baby A (who was not in state custody) and the setting in which Dr. Liou acted (a private hospital with no connection to the State) did not influence her professional decisions. *Cf. id.* at 831 (finding private hospital acted under color of state law when treating state prisoners in a "prison ward" inside the hospital where prisoners received care on more than an emergency basis); *Golbert*, 2021 WL 952528, at *6 (finding private hospital acted under color of state law where "DCFS's children made up a substantial proportion of [its] child patients" and the facility "actively sought out DCFS children and continued their hospitalizations for extended periods").

Second, the court in *Rodriguez* looked to the "degree of state control or coercion" in the medical professional's performance of the public function. *Rodriguez*, 577 F.3d at 827. The Parents argue that the TAC indicates that the State controlled or coerced the UCMC Defendants' decisions by alleging that UCMC worked with DCFS to develop UCMC's protective custody policy. However, as explained above, the TAC does not sufficiently allege that UCMC conspired or jointly acted with DCFS in creating that policy. To the contrary, the TAC indicates that DCFS did not condone UCMC's protective custody policy at the time Dr. Liou threatened to take protective custody of Baby A pursuant to the policy. Thus, the TAC does not sufficiently allege that DCFS controlled or coerced Dr. Liou's decision to do so; instead, it alleges she acted pursuant to a purely private policy. *See Lugar*, 457 U.S. at 940 (finding that where "respondents invoked the statute without the grounds to do so" and "act[ed] contrary to the relevant policy articulated by the State," the complaint failed to "state a cause of action under § 1983"); Doc. 37 ¶ 23 (alleging Dr. Liou "threatened to take the Scotts' baby into 'protective custody' pursuant to the express UCMC policy that authorized this and/or directed this").

21

Third, the *Rodriguez* court noted that a private entity cannot "be burdened with the responsibilities of the state . . . unless the entity assumes that responsibility voluntarily," and "the principal way, by which a private entity would undertake such a responsibility is by entering into a contractual relationship [with the State]." *Rodriguez*, 577 F.3d at 827. Here, the TAC does not allege a contractual relationship between UCMC and DCFS. Instead, it alleges only "an incidental and transitionary relationship" between the entities, which indicates that the State did not delegate a public function to Dr. Liou. *Id.* ANCRA obligates Dr. Liou to take temporary protective custody of children she encounters in the course of her regular medical practice only in certain circumstances. *See* 325 Ill. Comp. Stat. 5/5. Acting pursuant to this limited obligation "does not mean that [Dr. Liou] has agreed to step into the shoes of the state and assume the state's responsibility toward these persons." *Rodriguez*, 577 F.3d at 828. To the contrary, once a physician takes temporary protective custody of a child, ANCRA requires her to "immediately notify [DCFS]" and DCFS must then "promptly initiate proceedings under the Juvenile Court Act of 1987 for the continued temporary custody of the child" and direct the care of the child. 325 Ill. Comp. Stat. 5/5. Thus, the TAC does not allege that the UCMC Defendants voluntarily assumed the responsibilities of the State by implementing and enforcing its protective custody policy; instead, their responsibilities to, and relationship with, DCFS were incidental and transitionary. *See, e.g.*, *Rodriguez*, 577 F.3d at 827 (finding "an emergency medical system that has a preexisting obligation to serve all persons who present themselves for emergency treatment hardly can be said to have entered into a specific voluntary undertaking to assume the state's special responsibility to incarcerated persons").

Last, the *Rodriguez* court noted that "[t]o the degree that a private entity does not replace, but merely assists the state in [a public function], the private entity's responsibility for the

[public function] becomes more attenuated." *Id.* at 828. Here, as demonstrated by the temporary protective custody procedure set forth in ANCRA, private physicians such as Dr. Liou merely assist the state in taking temporary protective custody of children. They do not replace the State by doing so, but instead temporarily take custody of the child and then must immediately notify and coordinate with DCFS so that DCFS can retain custody of the child pending a court hearing. Thus, it is too "difficult to characterize [their] actions as the assumption of a function traditionally within the exclusive province of the state." *Id.*; *see also Mueller v. Auker*, 700 F.3d 1180, 1191–92 (9th Cir. 2012) (finding that a private hospital "did not become a state actor simply because it complied with state law requiring its personnel to report possible child neglect to [the child welfare agency]" (citations omitted)).

Overall, the TAC fails to sufficiently allege "such a 'close nexus'" between DCFS and Dr. Liou's threat to take Baby A into protective custody that the action can be fairly attributed to the State. *See Rodriguez*, 577 F.3d at 823 ("At its most basic level, the state action doctrine requires that a court find such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'" (citation omitted)). The Parents argue that determining whether such a close nexus exists is a "fact-intensive issue" and deciding it "on a motion to dismiss is unwarranted." Doc. 50 at 14. However, "acting under color of law" is a predicate of § 1983 claims, so the TAC's failure to sufficiently allege that the UCMC Defendants did so requires dismissal of the Parents' claims against them. *See Martin v. City of Chicago*, No. 12-cv-9207, 2015 WL 6560535, at *2 (N.D. Ill. Oct. 28, 2015) ("State action is an essential jurisdictional predicate under § 1983, and lack thereof warrants dismissal of the claim." (citation omitted)). Thus, because the TAC fails to sufficiently allege that the UCMC Defendants acted under color of state law, the Court dismisses all claims against them.

## II.     Dismissal with Prejudice

The UCMC Defendants urge the Court to dismiss the Parents' claims against them with prejudice because even on their fourth attempt, the Parents fail to plausibly allege that the UCMC Defendants acted under color of state law.  In response, the Parents did not request leave to amend if the Court granted the UCMC Defendants' motion.  Although the Court typically would provide the Parents with an opportunity to address the deficiencies identified in this Opinion, the Court finds that, in this specific case, providing the Parents with leave to amend their claims against the UCMC Defendants would be futile.  *See Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1008 (7th Cir. 2019) ("A district court does not 'abuse its discretion by failing to order, *sua sponte*, an amendment to [the complaint] that [the plaintiff] never requested.'" (alterations in original) (citation omitted)).  The Parents had the benefit of the Court's analysis of the sufficiency of the plaintiffs' claims in the related *Holderman* case and the related *Churnovic v. Walker* case, No. 20-cv-1619, 2021 WL 1379486 (N.D. Ill. Apr. 12, 2021), and amended their complaint in an attempt to overcome that analysis.  Yet, even with this benefit, the TAC does not suffice.  Thus, the Court concludes that further amendment would be futile and dismisses the Parents' claims against the UCMC Defendants with prejudice.  *See Stanard v. Nygren*, 658 F.3d 792, 801 (7th Cir. 2011) ("Leave to replead need not be allowed in cases of 'repeated failure to cure deficiencies by amendments previously allowed.'" (citation omitted)); *Anderson v. Deutsche Bank Nat'l Tr. Co.*, No. 14 C 5474, 2014 WL 6806891, at *2 (collecting cases).

## CONCLUSION

For the foregoing reasons, the Court grants the UCMC Defendants' motion to dismiss

[43]. The Court dismisses all claims against UCMC and Dr. Liou with prejudice.


Dated: May 5, 2022

_____
SARA L. ELLIS
United States District Judge